IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MOWAT CONSTRUCTION COMPANY, a
Washington corporation,

       Plaintiff,

    v.

DORENA HYDRO, LLC, an Oregon
limited liability company;
WESTCHESTER FIRE INSURANCE
COMPANY, a Pennsylvania surety
company,

       Defendants.

_____

DORENA HYDRO, LLC, an Oregon
limited liability company,

       Third-party plaintiff,

    v.

MOWAT CONSTRUCTION COMPANY, a
Washington corporation; LIBERTY
MUTUAL INSURANCE COMPANY, a
Massachusetts corporation,

       Third-party defendants.

_____

Case No. 6:14-cv-00094-AA

OPINION AND ORDER

John P. Ahlers
Ahlers & Cressman PLLC
999 Third Avenue, Suite 3800
Seattle, Washington 98104

Thomas A. Larkin
John Spencer Stewart
Tyler J. Storti
Stewart Sokol & Gray LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201
    Attorneys for plaintiff/third-party defendants

Page 1 - OPINION AND ORDER

John C. Theiss
Davis Wright Tremaine, LLP
1201 Third Avenue, Suite 2200
Seattle, Washington 98101

Marcus W. Eyth
Derek D. Green
Blake J. Robinson
Davis Wright Tremaine, LLP
1300 SW Fifth Avenue, Suite 2400
Portland, Oregon 97201
        Attorneys for defendant/third-party plaintiffs

AIKEN, Chief Judge:

Defendant and third-party plaintiff Dorena Hydro, LLC ("Dorena") seeks leave to interlocutorily appeal the Court's July 16, 2015, order ("Order") pursuant to 28 U.S.C. § 1292(b). In addition, Dorena moves for partial summary judgment, under Fed. R. Civ. P. 56, on its breach of contract counterclaim against plaintiff and third-party defendant Mowat Construction Company ("Mowat"). For the reasons set forth below, Dorena's motions are denied.

## BACKGROUND[1]

This dispute arises out of retrofitting activities that altered an existing flood control dam, located on Dorena Lake in Lane County, Oregon, with electrical generator equipment and facilities to produce hydroelectric power ("Project"). In early

---

[1] In moving for summary judgment, Dorena submitted hundreds of pages of documents relating to the parties' contract negotiations. Mowat furnished some of the same evidence, as well as additional materials regarding the original contractor and the parties' Project performance, in opposing summary judgment. Where duplicative, the Court cites to Dorena's submissions.

2011, Dorena, as Project owner,[2] sought proposals for the Project. Dorena initially named the James W. Fowler Company ("Fowler") as contractor. Among the issues negotiated between Dorena and Fowler was a group of work items, designated in the contract as "allowance items," which were not fully priced and would be adjusted at a later date based on the actual costs incurred. As negotiations progressed, Fowler became concerned that Dorena was designating large portions of the contract as allowance items in order to manipulate the Project price downward to meet its lender's funding requirements. Nevertheless, Fowler and Dorena reached an agreement on core terms and, in May 2011, executed a written contract. Notably, that agreement specified the pricing of allowance items was deferred and that an estimated price was used contingent upon renegotiation.[3]

In September 2011, Dorena proposed an amendment to the contract. This amendment, drafted by Dorena attorney Kirk Retz, declared that the "[c]ontractor used its best efforts to estimate of [sic] the actual cost of such allowance items," although they would be paid "on an actual cost basis." Stewart Decl. Ex. G, at 1-2. While the "best efforts" language was not incorporated into the

---

[2] It is undisputed that several other entities related to or in privity with Dorena, including Symbiotics, LLC, have been involved with the Project at various stages; the Court refers collectively to these entities as "Dorena."

[3] While the initial Dorena/Fowler agreement included a statement that the listed price constituted the "[c]ontractor's best estimate for the total cost of the work," it is undisputed that the pricing of the allowance items in fact came from the Schedule of Values ("SOV") provided by Dorena. Stewart Decl. Ex. E, at 28; Stewart Decl. Ex. J, at 6-7, 11-14.

final iteration of the Dorena/Fowler amended contract, the parties nonetheless agreed on a cost-reimbursable structure for allowance items.

By early 2012, despite the amended agreement, Dorena and Fowler were at odds regarding the Project design, allowance item pricing, and Dorena's ability to assure payment. The relationship continued to deteriorate and, in March or April 2012, Dorena terminated Fowler's contract.

Brent Smith, Dorena's designated representative at all relevant time, contacted Tim Calohan, Mowat's project manager, who was doing preconstruction work on Dorena's other hydroelectric ventures, and asked whether Mowat would be interested in taking over the Project. After conferring with Geno Jorgensen, Mowat's division management, Calohan responded to Smith in the affirmative.

In early April 2012, Smith and Jef Krohn, Dorena's senior project manager, detailed to Calohan and Jorgensen various aspects of the Project. Amongst other topics, Smith and/or Krohn discussed that Dorena risked losing its financing if it did not have a contractor under contract shortly and, as a result, Dorena intended to use cost-reimbursable allowance items. Specifically, Smith clarified that "placeholder" numbers would be used for allowance items until their actual costs could be determined, which "would be what would be paid." Stewart Decl. Ex. J, at 13-19.

On April 2, 2012, in anticipation of the parties' first in-person meeting, Krohn sent an email to Calohan attaching an SOV. Because the allowance categories did not list any values, Calohan

replied on April 6, 2012: "I need the actual $ value to plug-in for the allowance items [as it] was not on the spreadsheet you sent." First Theiss Decl. Ex. 16, at 1. Krohn eventually sent a completed SOV with "the original engineer [Bingham Engineering's] estimated cost for these items" and remarking "I know you didn't have enough time to price out all of it [so] I'll let you decide what you would like to include as allowance items or not." Id.; Stewart Decl. Ex. J, at 11-12.

Thereafter, Retz drafted and circulated a form agreement for a fixed contract price - i.e. no allowance items. First Theiss Decl. Ex. 11, at 1, 29-30. On April 18, 2013, Retz published a "redline" draft addressing several issues that Jorgensen had raised, as well as inserting the same allowance items provision that Dorena had attempted to use in amending Fowler's contract, including the same typo. Compare Stewart Decl. Ex. G, at 1-2, with First Theiss Decl. Ex. 12, at 1, 29-30; see also Stewart Decl. Ex. J, at 4, 6, 11-14 (Smith testifying that he "came up with the contract with allowance items and had Kirk Retz draft it").

On April 20, 2012, Calohan emailed Krohn with an updated SOV, wherein Mowat had filled in proposed pricing for the various non-allowance items that had been left blank in the last version provided by Krohn, explaining "I think it would be best if . . . you can work on how we want to show the allowance items." Stewart Decl. Ex. P, at 1. That same day, Calohan, Jorgensen, Smith, and Retz met in Mowat's Woodinville, Washington, office to finalize contract negotiations. Jorgensen, Calohan, and Smith agreed that

"best efforts" under the truncated time-frame meant only that Mowat had worked with Dorena to identify potential work items not covered by Dorena's SOV. See, e.g., Eyth Decl. Ex 1, at 2-7, 9-12; First Theiss Decl. Ex. 7, at 7; First Theiss Decl. Ex. 8, at 2-3; First Theiss Decl. Ex. 9, at 3-7; Stewart Decl. Ex. J, at 11-19, 26; Stewart Decl. Ex. K, at 3-7; Stewart Decl. Ex. L, at 8-13; Stewart Decl. Ex. M, at 16-18; see also First Theiss Decl. Ex. 7, at 4 ("[Mowat] needed, like, a month and a half or something to look at the drawings to provide a - an accurate estimate" but Dorena was "under a time crunch to get the contract written and done").

The April 20, 2012, meeting resulted in the SOV that was ultimately used as Attachment A to the final Dorena-Mowat agreement ("Contract"), which was executed on or around April 24, 2012. See generally Eyth Decl. Ex. 4; First Theiss Decl. Ex. 13. With the exception of the bid items Mowat added to complete the SOV, the dollar values for virtually all of the allowance items remained unchanged from the list originally provided by Krohn and, in turn, matched the figures employed in Fowler's agreement.

The parties' relationship began to devolve shortly after the Project was initiated in the summer of 2012. They nevertheless continued their construction efforts, and even renegotiated the Contract to allow for acceleration, because Dorena was to receive a substantial grant if the Project was completed by the end of 2013. In December 2013, Dorena ordered Mowat to replace Calohan as project manager pursuant to the Contact; Mowat refused.

On January 17, 2014, Mowat initiated this lawsuit, asserting several contract-related claims arising out of Dorena's alleged failure to pay millions of dollars due and owing, and significant Project delays. On February 4, 2014, Dorena terminated Mowat's Contract and produced an exit plan that required Mowat to fully vacate the Project site by February 7, 2014. On February 5, 2014, Mowat filed an amended complaint; Dorena timely answered and alleged several affirmative defenses and counterclaims. Mowat subsequently repeatedly requested permission to have an on-site representative present, subject to reasonable terms and restrictions, while the Project was being completed; Dorena denied these requests. On April 4, 2014, the Court granted in part and denied in part Mowat's motion for entry onto the Project site.

On June 11, 2014, Mowat filed a second amended complaint adding a claim under the Miller Act, as well as adding defendant Westchester Fire Insurance Company. Dorena responded by reiterating its affirmative defenses and counterclaims against Mowat, and alleging new counterclaims against third-party defendant Liberty Mutual Insurance Company.

On May 18, 2015, the Court granted non-party EC Company's motion to quash the subpoena duces tecum issued by Dorena to the extent it was premised on Dorena's purported need for five years' worth of EC Company's records relating to other hydroelectric projects. The Court then granted, via the Order, Dorena's motion to add HydroTech Engineering, LLC, Dongfang Electric Company, and Dongfeng Electric Machinery Company, Ltd., manufacturers and/or

suppliers of the underlying turbines, as defendants. The Court further granted Mowat's motion to bifurcate, thereby allowing the case to proceed in two phases – the first phase limited to the issue of whether Dorena or Mowat breached the Contract, and the second phase devoted to any remaining issues. At that time, the parties were ordered to submit within 30 days a stipulated scheduling report setting forth a time-line for trial phases one and two, as well as for discovery related to the new third-party claims.

On July 30, 2015, Dorena moved for partial summary judgment. On August 12, 2015, Dorena moved for leave to file an interlocutory appeal. On August 14, 2015, the parties filed a scheduling report detailing their various points of disagreement regarding the scope of discovery and time-frame for phase one of trial.

## STANDARDS

Three criteria must be met before the court can issue an order certifying an interlocutory appeal: (1) "a controlling question of law" must be present; (2) there must be a "substantial ground for difference of opinion" as to the controlling question of law; and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Certifications under 29 U.S.C. § 1292(b) are reserved for "extraordinary cases." U.S. Rubber Co. v. Wright, 359 F.2d 784, 785 (9th Cir. 1966); see also James v. Price Stern Sloan, Inc., 283 F.3d 1064, 1068 n.6 (9th Cir. 2002) ("[s]ection 1292(b) is a departure from the normal rule that only final judgments are

appealable, and therefore must be construed narrowly"). The party seeking the interlocutory appeal bears the burden of establishing that "all three § 1292(b) requirements are met." Couch v. Telescope, Inc., 611 F.3d 629, 633 (9th Cir. 2010).

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 630.

I.  Motion for Interlocutory Appeal

Dorena contends that leave to file an interlocutory appeal should be granted because it is "entitled to a jury in the first stage of the bifurcated trial." Dorena's Mot. Interlocutory Appeal 4.

As a preliminary matter, the Order's only reference to a bench trial was made in recognition of Mowat's request for bifurcation. Order 4. Thus, the Court's ruling was limited to whether bifurcation was appropriate and whether Dorena was entitled to file a third-party complaint.[4] See generally id. Indeed, Dorena acknowledges that the Court withheld consideration of whether phase one would proceed as a bench or jury trial. See Dorena's Mot. Interlocutory Appeal 2-3 (seeking leave to file an interlocutory appeal "only to the extent [the Order] determines the first stage of the bifurcated trial will be tried to the court" and noting that the "Order did not address [its] argument that the first stage of the trial should be to a jury"). As such, Dorena's motion is not ripe. See W. Oil & Gas Ass'n v. Sonoma Cnty., 905 F.2d 1287, 1290 (9th Cir. 1990), cert. denied, 498 U.S. 1067 (1991) ("[t]he ripeness inquiry asks whether there yet is any need for the court to act").

---

[4] As a result of the parties' failure to comply with the Order's instruction to file a stipulated scheduling report, this case cannot proceed to the pre-trial stage, during which any evidentiary disputes would be resolved and the Court would determine whether phase one advances as a bench or jury trial. The present motions further prolong the advancement of this case.

Regardless, Dorena neglected to carry its burden in relation to the three requisite elements. Accepting that a controlling question of law is present, Dorena does not meaningfully address whether a substantial ground for difference of opinion exists or whether an immediate appeal from the Order would materially advance the ultimate termination of this case. Rather, Dorena simply concludes it has a right to a jury trial on any Contract-related claims under the Seventh Amendment and that, "if stage one is tried to the court and the court rules in Mowat's favor, [they] can argue on appeal that they were deprived of th[is] right." Dorena's Mot. Interlocutory Appeal 5-6.

Yet the fact that "[c]laims for breach of contract are historically 'legal'" does not mean that proceeding with a bench trial during phase one would constitute reversible error. Myers v. U.S. Dist. Ct. for Dist. of Mont., 620 F.2d 741, 743-44 (9th Cir. 1980). Mowat has maintained throughout the entirety of this litigation that "the evidence . . . overwhelmingly supports [its] position that Dorena's attempted termination 'for default' was completely without basis and was merely a pre-textual retaliation for Mowat initiating this action to recover the millions of dollars it is owed." Mowat's Resp. to Mot. Interlocutory Appeal 5. As addressed in section II, Mowat's position is not without merit. Accordingly, a threshold issue exists concerning whether the evidence is such that a reasonable jury could return a verdict for Dorena. If Mowat is entitled to judgment as a matter of law on its wrongful termination claim, proceeding with a bench trial could be

the most efficient and judicious means of resolving phase one of this dispute. See Fuller v. City of Oakland, 47 F.3d 1522, 1533 (9th Cir. 1995) (denial of a jury trial in a civil case does not constitute harmful, reversible error where the "district court could have granted a judgment as a matter of law") (citations and internal quotations omitted); see also United States v. Cal. Mobile Home Park Mgmt. Co., 107 F.3d 1374, 1380 (9th Cir. 1997) (affirming the district court's judgment, even though it "erred by denying [the plaintiff] her right to demand a jury trial," because, "[u]pon the evidence presented to the district court, no reasonable jury could have found for [the plaintiff]") (citation omitted).

Finally, given the protracted and antagonistic nature of this lawsuit, in conjunction with the fact that the parties are on the precipice of proceeding with phase one of trial, allowing a piecemeal interlocutory appeal on the narrow collateral question of Dorena's entitlement to a jury trial would only result in increased complexity and additional delay. See Richardson-Merrell, Inc. v. Koller, 472 U.S. 424, 440 (1985) (generally cautioning against "succumb[ing] to enticing suggestions to abandon the deeply-held distaste for piecemeal litigation") (citation and internal quotations omitted); see also Brizzee v. Fred Meyer Stores, Inc., 2008 WL 426510, *3 (D.Or. Feb. 13, 2008) ("[e]ven when all three statutory criteria are satisfied, district court judges have unfettered discretion to deny certification") (citations and internal quotations omitted). Dorena's motion for an order allowing an interlocutory appeal is denied.

II.  <u>Motion for Partial Summary Judgment</u>

To establish a claim for breach of contract, the plaintiff must prove "the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach and defendant's breach resulting in damage to plaintiff." Slover v. Or. State Bd. of Clinical Soc. Workers, 144 Or.App. 565, 570, 927 P.2d 1098 (1996) (citation and internal quotations omitted).

A.  Contract Terms

Section 2.5A of the Contract provides: "[p]rior to the execution of this agreement, Contractor met with Owner, fully investigated the Site, fully investigated the documents referenced in the RFP and assisted Owner in the development of the information that forms the Scope of Work listed in Attachment A [and] Owner has relied on Contractor's construction expertise." First Theiss Decl. Ex. 13, at 16. The Contract's compensation provision, section 7.1, states:

> The Contract Price is Fourteen Million, Six Hundred Seventy Thousand, Seven Hundred Seventy Nine Dollars and 02/100 ($14,670,779.02) as more fully set forth in the schedule of values in Attachment A (the "Contract Price") . . . A portion of the Contract Price contains allowance items. Contractor used its best efforts to estimate of [sic] the actual cost of the allowance items. Contractor will be paid for allowance items on an actual cost basis. To incentivize Contractor to minimize the cost of these allowance items, Contractor's overhead and profit is calculated based on the Contract Price minus the allowance items. Contractor will receive no overhead or profit for any such allowance items.

Id. at 28 (emphasis added). Attachment A, in turn, specifies that "[a]llowance item pricing is budgetary only, provided by . . .

Bingham Engineering, and [is] subject to change per actual construction costs." Id. at 53.

B.    Interpretative Framework

In interpreting a contract under Oregon law, the court employs a three-step analysis. Yogman v. Parrott, 325 Or. 358, 361, 937 P.2d 1019 (1997) (citations omitted). First, the court determines whether the contractual provision is ambiguous. Batzer Const., Inc. v. Boyer, 204 Or.App. 309, 315, 129 P.3d 773, rev. denied, 341 Or. 366, 143 P.3d 239 (2006) (citations omitted). A contractual term is ambiguous "if it has no definite significance or if it is capable of more than one sensible and reasonable interpretation." Id. at 313 (citation and internal quotations omitted). In addition to the text and context, the court considers the circumstances surrounding the creation of a written agreement, including "the parties' precontract negotiations." Id. at 316-20 (citations omitted); see also Or. Rev. Stat. § 41.740 (outlining three exceptions to the general rule prohibiting courts from considering extrinsic evidence to establish the terms of a written agreement). "The court must, if possible, construe the contract so as to give effect to all of its provisions." Williams v. RJ Reynolds Tobacco Co., 351 Or. 368, 379, 271 P.3d 103 (2011).

Second, if the text, context, and circumstances of formation evince ambiguity, the court evaluates extrinsic evidence of the contracting parties' intent. Batzer, 204 Or.App. at 316-17 (citations omitted). If the "provision remains ambiguous after the first two steps have been followed, the court relies on appropriate

maxims of construction" to determine the provision's meaning. Yogman, 325 Or. at 364.

Disposition of a contract dispute as a matter of law is generally not appropriate unless the meaning of the disputed provision "is so clear as to preclude doubt by a reasonable person." Deerfield Commodities v. Nerco, Inc., 72 Or.App. 305, 317, 696 P.2d 1096, rev. denied, 299 Or. 314, 702 P.2d 1111 (1985); see also PGF Care Ctr., Inc. v. Wolfe, 208 Or.App. 145, 151, 144 P.3d 983 (2006) (summary judgment is proper where the court finds no ambiguity at the first step of this analysis).

C.   Analysis

Dorena asserts that summary judgment is warranted on its breach of contract claim because Mowat "made no independent effort to estimate allowance item costs - contrary to its representation in the Contract." Dorena's Mot. Partial Summ. J. 16. To reach this conclusion, Dorena construes the Contract's "best efforts" provision as unambiguously requiring Mowat to have utilized "diligent efforts to appraise or value the actual cost of the allowance items." Dorena's Reply to Mot. Partial Summ. J. 10. In other words, Dorena maintains that Mowat breached the Contract because the actual cost of the allowance items, as determined through the construction process, exceeded those listed in the SOV and, by extension, endorsed by Mowat. See, e.g., Dorena's Mot. Partial Summ. J. 11, 16-17.

Where, as here, the agreement does not define "best efforts" or the corresponding obligation - i.e. to "estimate" - courts

generally decline resolving breach of contract claims at summary judgment. See Samica Enters., LLC v. Mail Boxes Etc. USA, Inc., 637 F.Supp.2d 712, 717 (C.D.Cal. 2008) ("[w]hether a defendant used best efforts under the circumstances is a factual question usually reserved for the jury") (citation omitted); see also Television Events & Mktg., Inc. v. AMCON Distrib., Co., 484 F.Supp.2d 1124, 1133 (D.Hawai'i 2006) (collecting cases discussing the variable "best effort" standards to conclude that "the exact contours of the obligation to fulfill a 'best efforts' clause are unclear"); United Telecomm v. Am. Television & Comm. Corp., 536 F.2d 1310, 1319 (10th Cir. 1976) (because both parties "introduced evidence bearing on the negotiations and the meaning intended for the term 'best efforts' . . . a question for the jury [exists]"); Triple-A Baseball Club Assocs. v. N.E. Baseball, Inc., 832 F.2d 214, 228 (1st Cir. 1987), cert. denied, 485 U.S. 935 (1988) ("[w]e have found no cases, and none have been cited, holding that 'best efforts' means every conceivable effort" and finding no breach of contract even though the plaintiff "made little effort").

In any event, the text and context of section 7.1 cannot, as a matter of law, be interpreted solely as Dorena suggests. The dictionary defines "best efforts" as "diligent attempts to carry out an obligation . . . measured by the measures a reasonable person in the same circumstances and of the same nature as the acting party would take." Black's Law Dictionary 191 (10th ed. 2014). Thus, although reasonable diligence is the cornerstone of "best efforts," that term is inherently flexible. Id.; see also

_Equal Emp't Opportunity Comm'n v. R.J. Gallagher Co._, 181 F.3d 645, 652 (5th Cir. 1999) ("'[b]est efforts' means such efforts as are reasonable in the light of that party's ability and the means at its disposal and of the other party's justifiable expectations") (citation and internal quotations omitted). An examination of the circumstances surrounding the Contact's formation is therefore critical to determining whether the "best efforts" provision is ambiguous.

"Estimate" is more straightforward. That word means "[t]o calculate approx[imately] the amount or extent of." Webster's II New Riverside Univ. Dictionary 444 (1988). Courts have repeatedly construed this term consistently with the presiding dictionary definition. See _Nev. Rest. Servs., Inc. v. Clark Cnty._, 981 F.Supp.2d 947, 957 (D.Nev. 2013) ("Merriam-Webster defines 'estimate' as 'a rough or approximate calculation'") (citation omitted); _Rental Equip., Inc. v. McDaniel Builders, Inc._, 91 Cal.App.4th 445, 449, 109 Cal.Rptr.2d 922 (2001) ("[t]he dictionary definition of 'estimate' is 'an approximate computation of the probable cost of a piece of work made by a person undertaking to do the work'") (citation omitted); see also _Kruse Concepts, Inc. v. Shelter Mut. Ins._, 16 S.W.3d 734, 738 (Mo.App.E.D. 2000) (an "estimate [is] not a statement of fact" for the purposes of a misrepresentation claim) (citation omitted).

Accordingly, as a matter of plain meaning, Dorena's position is unfounded.[5] "Estimate" is a term that, by its very nature, connotes inexactness. See Pub. Serv. Elec. & Gas Co. v. N.J. Dep't of Envtl. Prot., 101 N.J. 95, 108, 501 A.2d 125 (1985) ("[b]y definition, an estimate is a mere approximation [that] precludes accuracy, and its ordinary meaning is to calculate roughly or to form an opinion from imperfect data [such that the term imbues] no more certainty than the words 'about' or 'more or less'") (citation and internal quotations and brackets omitted). As a result, nothing in the Contract unequivocally required Mowat's "best efforts" to accurately reflect the market value of the allowance items that would ultimately be utilized during the Project.

To reach a contrary result would require this Court to omit the two sentences following the "best efforts" provision in section 7.1, as well as Attachment A. These portions of the Contract clearly articulate that, notwithstanding any estimate furnished by Mowat, allowance items would be compensated without "overhead or profit" on "an actual cost basis," which could only be determined prospectively once construction was underway.[6] First Theiss Decl.

---

[5] Accepting Dorena's reading as reasonable merely renders the "best efforts" provision ambiguous. See Cent. Or. Indep. Health Servs., Inc. v. State, 211 Or.App. 520, 529, 156 P.3d 97, rev. denied, 343 Or. 159, 164 P.3d 1160 (2007) ("the threshold to show ambiguity is not high") (citation and internal quotations and brackets omitted).

[6] Dorena's reliance on section 22.15 of the Contract - which states, "[i]n the event of any conflict or inconsistency between a provision in one document and a provision in another document, the document with the higher priority [and/or] that requires the highest standard of performance on the part of the Contractor shall control" - is misplaced. First Theiss Decl. Ex. 13, at 44-

Ex. 13, at 28, 53. In sum, irrespective of the exact contextual confines of the phrase "best efforts," the sentence at issue, when read in its entirety and in conjunction with the Contract as a whole, can be rationally interpreted as imposing an obligation on Mowat to, given the time constraints inherent to the Project, provide a rough approximation as to value. That is precisely what transpired here.

Evidence of the underlying circumstances of Contract formation further corroborate the parties' mutual intent, as evinced in the text and context of the Contract, regarding Mowat's "best efforts." Jorgensen, Calohan, and Smith each independently testified that, due to the extremely limited time-frame and incomplete design information, the "best efforts" provision merely required Mowat to work with Dorena to identify any reasonably foreseeable work items not covered in Bingham Engineering's SOV.[7] Eyth Decl. Ex. 1, at 2-

_____

45. The Court finds that sections 2.5A and 7.1 are in harmony with Attachment A, such that no issue exists as to priority.

[7] Dorena implies in a footnote that Mowat had sufficient time to "properly estimate allowance item costs" because "Dorena provided Mowat with the [SOV] on April 6, 2012," and Mowat submitted a "bid for the [P]roject in 2011." Dorena's Mot. Partial Summ. J. 9 n.3 (citations omitted); see also Morales v. Woodford, 388 F.3d 1159, 1168 n.14 (9th Cir. 2004), cert. denied, 546 U.S. 935 (2005) (court need not consider substantive arguments raised only in a footnote). As discussed herein, however, the uncontravened evidence of record establishes that the parties were in agreement that Mowat did not have adequate time to evaluate the actual cost of the allowance items prior to the date on which the Contract was executed. See, e.g., Eyth Decl. Ex. 1, at 2-7, 9-12; Eyth Decl. Ex. 3, at 4; Eyth Decl. Ex. 6; First Theiss Decl. Ex. 7, at 4-5; First Theiss Decl. Ex. 8, at 2; First Theiss Decl. Ex. 9, at 3-7; First Theiss Decl. Ex. 16, at 1. Furthermore, that Smith also testified he anticipated Mowat would "do [its] own estimate" simply establishes a disputed issue of material fact. Compare First Theiss Decl. Ex. 9, at 3, with

7, 9-12; First Theiss Decl. Ex. 7, at 7; First Theiss Decl. Ex. 8, at 2-3; First Theiss Decl. Ex. 9, at 3-7; Stewart Decl. Ex. J, at 11-19, 26; Stewart Decl. Ex. K, at 3-7; Stewart Decl. Ex. L, at 8-13; Stewart Decl. Ex. M, at 16-18; see also Batzer, 204 Or.App. at 321 ("[i]f, as part of the transaction in explaining the term, one of the parties had made an admission as to what a term meant, that would be admissible against him") (citation and internal quotations and brackets omitted).

Moreover, Dorena furnished no argument or evidence indicating that had Mowat made an independent effort to estimate allowance item costs prior to Contract formation, its behavior would have been different. See generally Dorena's Mot. Partial Summ. J.; Dorena's Reply Partial Summ. J.; see also Nat'l Data Payment Sys., Inc. v. Meridian Bank, 212 F.3d 849, 854 (3d Cir. 2000) (denying summary judgment under analogous circumstances); Samica, 637 F.Supp.2d at 718 (plaintiffs could "not maintain a breach of contract claim based on the 'best efforts' provision" where "they have not raised a genuine issue that [their companies] would have acted any differently had [the defendants] exerted greater effort"). In fact, the record before the Court generally reflects that Dorena had a strong incentive to get a contractor under contract within a specified time-frame such that Dorena was intent on going forward with Mowat once Fowler was terminated.

Finally, the parties' summary judgment arguments predominately relate to the meaning of the "best efforts" provision and whether

---

Stewart Decl. Ex. J, at 11-19, 26.

Mowat's actions complied therewith. In other words, neither party meaningfully addresses whether the breach was material; however, this is a condition precedent to recovery. See Dorena's Mot. Partial Summ. J. 16-17 (concluding only that the breach was material because the actual cost of the Project was millions of dollars more than anticipated[8] and, "at Contract formation, the allowance items were identified as critical features"). Therefore, the Court is not convinced that, even assuming the "best efforts" provision could be interpreted exclusively as proposed by Dorena, summary judgment would be appropriate. Indeed, it is difficult to see how a representation related to a past circumstance - i.e. one that was completed prior to the execution of the agreement and long before work was contemplated to begin - could render the allegedly non-defaulting party incapable of performance or make it impossible to carry out the agreement as intended.[9] See Lannaghan v. First Horizon Home Loans, 2011 WL 3273161, *3 (D.Or. July 27, 2011) ("[t]he non-breaching party's performance will be excused, and the contract rescinded, only if the breach was material," which means the breach "goes to the essence of the contract, and renders the

---

[8] Although not dispositive, the Court notes that Mowat introduced a deluge of unrefuted evidence demonstrating that the increase in the actual cost of allowance items was largely due to Project delays and design changes caused by Dorena. See., e.g., Mowat's Resp. to Mot. Partial Summ. J. 20-24; Stewart Decl. Exs. R-T; Second Theiss Decl. Ex. 20.

[9] Dorena has not cited to, and the Court is not aware of, any authority in which a breach of a non-prospective "best efforts" provision was material. See Dorena's Mot. Partial Summ. J. 12-14 (citing to only one out-of-circuit case wherein a breach of the "best efforts" provision, which created an affirmative duty to maximize future revenues, resulted in liability).

defaulting party incapable of performance, or makes it impossible for him to carry out the contract as intended") (citations and internal quotations omitted); see also Commerce Mortg. Co. v. Indus. Park Co., 101 Or.App. 345, 349, 791 P.2d 132 (1990) (as modified), rev. denied, 311 Or. 87, 804 P.2d 1169 (1991) (whether a breach is material "is ordinarily a question of fact for the jury"). This is especially true given that Dorena and Mowat completed 95% of the Project together pursuant to the Contract and there was undisputedly a meeting of the minds concerning the fact that allowance items would be compensated on an actual cost basis, regardless of Mowat's "best efforts." As such, Dorena failed to carry its initial burden in regard to this element. Dorena's motion for partial summary judgment is denied.

## CONCLUSION

Dorena's motion for an order allowing interlocutory appeal (doc. 84) is DENIED. Dorena's partial motion for summary judgment (doc. 76) is also DENIED. The parties' requests for oral argument are DENIED as unnecessary. The parties shall submit, within 20 days of the date of this Opinion, an amended stipulated scheduling report setting forth a mutually agreed upon time-line for trial phases one and two, as well as for discovery related to the third-party claims, or the Court will consider sanctions.

IT IS SO ORDERED.

Dated this 23rd of September 2015.

_____
Ann Aiken
United States District Judge